

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2001 FEB 23  PM 5: 13

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

IN RE:

MASTERCARD
INTERNATIONAL INC.,
INTERNET GAMBLING
LITIGATION, and VISA
INTERNATIONAL SERVICE
ASSOCIATION INTERNET
GAMBLING LITIGATION

THIS DOCUMENT RELATES TO
ALL ACTIONS

CIVIL ACTION
MDL NOS. 1321 & 1322

SECTION (K)

JUDGE DUVAL
MAG. JUDGE CHASEZ

## ORDER AND REASONS

This multidistrict litigation arises from allegations that MasterCard International, Visa

International and several banks that issue MasterCard and Visa credit cards have interacted with

a number of Internet casinos in a manner that violates United States law.  Numerous putative

class actions were filed in district courts in the Northern District of Illinois, the Middle District of

Alabama, the Southern District of Alabama, the Southern District of New York, and the Northern

District of California.  The federal actions were transferred to the Eastern District of Louisiana by

order of the Judicial Panel on Multidistrict Litigation on March 1, 2000, with this Court receiving

1

DATE OF ENTRY
FEB 2 6 2001

Fee_____
Process_____
X_Dktd___
_V_CtRmDep___
Doc.No._____

the cases on March 20, 2000.[1]  By minute entry dated June 14, 2000 (record document 12) this

Court ordered that the parties in two "test" cases, one from MDL-1321 and one from MDL-1322,

file, respond and reply to motions pursuant to Federal Rule of Civil Procedure 12 and  Federal

Rule of Civil Procedure 19 with respect to federal law claims only.  See Minute Entry, June 14,

_____

[1]Initially 11 cases were transferred to this Court.  MDL 1321 and MDL 1322 were
consolidated for pre-trial purposes by order entered April 3, 2000.With the tag along cases that
subsequently followed, there are now 33.  Those cases are:  Brown v.  MasterCard International,
Inc.  et al, C.A. 00-0657 (original docket no.  99-778, M.D. Ala.); Maple v.  Capital One Bank, et
al, C.A. 00-0658 (original docket no., 99-665, M.D. Ala.); Eisele v.  MasterCard Int., Inc.  et al,
C.A. 00-0659 (original docket no.  99-8746, M.D. Ala.); Eisele v.  MasterCard Int., Inc.  et al,
C.A. 00-0660 (original docket no.  99-8784, S.D.N.Y.); Eisele v.  MasterCard Int., Inc. et al,
C.A. 00-0661 (original docket no.  99-8785, S.D.N.Y.); Cote v.  MasterCard Int., Inc. et al, C.A.
00-1985 (original docket no.  00-3709, S.D.N.Y.); Thompson v.  MasterCard Int., Inc. et al, C.A.
00-1986 (original docket no.  00-3710, S.D.N.Y.); Bradley v.  MasterCard Int., Inc.  et al, C.A.
00-1987 (original docket no.  00-3712, S.D. N.Y); Siverlieb v.  MasterCard Int., Inc.  et al, C.A.
00-1988 (original docket no.  00-3713, S.D.N.Y.); Keys v.  MasterCard Int., Inc.  et al, C.A. 00-
1989 (original docket no.  00-3714, S.D.N.Y.); Silverlieb v.  MasterCard Int., Inc.  et al, C.A. 00-
1990 (original docket no.  00-3715, S.D.N.Y.); Erwin v.  MasterCard Int., Inc.  et al, C.A. 00-
1991 (original docket no.  00-3716, S.D.N.Y.); Thompson v.  MasterCard Int., Inc.  et al, C.A.
00-1993; Bradley v.  MasterCard, C.A. 00-1994 (original docket no.  00-3718, S.D.N.Y.);
Freeman v.  Providian National Bank et al, C.A. 00-0662 (original docket no.  99-108, M.D.
Ala.); Freeman v.  Citibank Corp. et al, C.A. 00-0663 (original docket no.  98-3029, M.D. Ala.);
Jones v.  Visa International Svc. Assoc., et al.  C.A. 00-0664 (original docket no.  99-785, N.D.
Ala.);   Eisele v.  Visa Int.  Svc.  Assoc., et al, C.A. 00-0665 (original docket no.  99-4669, N.D.
Cal.); Eisele v.  Visa Int.  Svc.  Assoc., et al, C.A. 00-0666 (original docket no.99-3829, N.D.
Cal.); Eisele v.  Visa Int.  Svc.  Assoc., et al, C.A. 00-0667 (original docket no.  99-4833, N.D.
Ill.); Eisele v.  Visa Int.  Svc.  Assoc, et al, C.A. 00-1168 (original docket no.  99-5065, N.D.
Cal.); Eisele v.  Visa Int.  Svc.  Assoc., et al., C.A. 00-1169 (original docket no.  99-5067, N.D.
Cal.); Normand v.  Visa Int.  Svc.  Assoc., et al, C.A. 00-1170 (original docket no.  99-5068,
N.D. Cal.); Thompson v.  Visa Int.  Svc.  Assoc., et al, C.A. 00-1171 (original docket no.  99-
5069, N.D. Cal.); Thompson v.  Visa Int.  Svc.  Assoc., et al, C.A. 00-1172 (original docket no.
99-5070, N.D. Cal.); Silverlieb v.  Visa Int.  Svc.  Assoc., et al, C.A. 00-1995 (original docket
no.  00-1773, N.D. Cal.); Thompson v.  Visa Int. Svc. Assoc., et al, C.A. 00-1996 (original
docket no. 00-1774, N.D. Cal.); Cote v.  Visa Int. Svc. Asoc., et al, C.A. 00-1997 (original
docket no.  00-1776, N.D. Cal.); Silverlieb v.  Visa Int.  Svc.  Assoc., et al, C.A. 00-1998
(original docket no.  00-1778, N.D. Cal.); Silverlieb v.  Visa Int.  Svc.  Assoc., et al, C.A. 00-
1999 (original docket no.  00-1779, N.D. Cal.); Thompson v.  Visa Int.  Svc.  Assoc., C.A. 00-
2000 (original docket no.  00-1780, N.D.Cal.); Erwin v. Visa Int. Svc. Assoc., et al, C.A. 00-
2001 (original docket no. 00-1775, N.D. Cal.); and  Bradley v. Visa Int. Svc. Assoc., et al, C.A.
00-2002 (original docket no. 00-1777, N.D. Cal.).

2000.  In accordance with that order, plaintiffs selected <u>Larry Thompson v.  MasterCard International, Inc., Fleet Bank (Rhode Island), N.A. and Fleet Credit Card Services, L.P.</u>, C.A. No.  00-1986 as the MDL-1321 test case and <u>Lawrence Bradley v.  Visa International Service Assoc. and Travelers Bank USA Corp.</u>, C.A. 00-2002 as the MDL-1322 test case.  All motions in all other cases that are part of this multidistrict litigation were ordered deferred until after the Court has ruled on the two motions described above.  <u>See</u> Minute Entry, June 14, 2000.  Also deferred pending resolution of the test case motions were plaintiffs' duties with respect to moving for class certification under Local Civil Rule 23.1 and all discovery.  <u>Id</u>.

Presently before the Court are Rule 12(b)(6) motions to dismiss for failure to state a claim upon which relief can be granted and  Rule 19 motions for joinder or dismissal for non-joinder filed by MasterCard International Inc.  (record documents 19 & 20), Fleet Bank and Fleet Credit Card Services (record document 21), Visa International Services Association (record documents 17 & 18), and Travelers Bank (record document 16).  These motions have been filed in accordance with the Court's mutidistrict litigation management order entered June 14, 2000 and are limited to defendants' liability under federal law, namely the Racketeer Influenced and Corrupt Organizations Act ("RICO"), found at 18 U.S.C. §1961 <u>et seq</u>.   The Court heard oral argument on the motions on September 13, 2000 and has considered the pleadings, memoranda and relevant law and finds that the motions to dismiss shall be granted for the reasons that follow.

The Court will analyze the Rule 12 (b)(6) motions as follows:

I.          Background
II.         Standard for Motion to Dismiss
III.        The Racketeer Influenced and Corrupt Organizations Act ("RICO"), Generally

3

IV.               Elements Common to All RICO claims
         A. The Existence of a RICO Person
         B. The Alleged Pattern of Racketeering Activity
            1. Alleged Predicate Acts Under State Law
                a. New Hampshire Law
                b. Kansas Law
            2. The Wire Act, 18 U.S.C. §1084
            3. Mail Fraud, 18 U.S.C. §1341 and Wire Fraud, 18 U.S.C. § 1343
            4. Other Federal Laws
            5. Collection of Unlawful Debt
         C. Enterprise
            1. Generally
            2. Existence Separate and Apart From the Pattern of Racketeering
               Activity
            3. An Ongoing Organization with a Hierarchal or Consensual
               Decision Making Structure
V.              Additional Elements Discrete to 18 U.S.C. §1962(c)
         A. Conduct
         B. Person/Enterprise Distinctness
VI.             Aiding and Abetting Liability under 18 U.S.C. §1962(c)
VII.           Standing to Assert a Civil RICO Claim under 18 U.S.C. §1964 for Violations of
              18 U.S.C. §1962 (c)

## The Rule 12(b)(6) Motions

### I. Background

The factual and legal allegations by plaintiffs in each of the two actions before the Court are nearly identical; therefore, the Court will set out the factual background in the form of a single narrative and indicate where the factual allegations or legal theories diverge. For purposes of this motion, the following are taken as true.

Larry Thompson ("Thompson) and Lawrence Bradley ("Bradley") (together referred to as "plaintiffs") filed class action complaints on behalf of themselves and others similarly situated against certain credit card companies and issuing banks for those entities alleged illegal involvement with the internet gambling industry. Named as defendants by Thompson are

4

MasterCard International, Inc. ("MasterCard"), Fleet Bank and Fleet Credit Card Services ("Fleet"). Those named as defendants by Bradley are Visa International Service Association ("Visa") and Travelers Bank USA Corp ("Travelers").[2]

Plaintiffs' class action complaints allege that defendants have violated several federal and state laws with respect to defendants' involvement with internet casinos. Plaintiffs argue that defendants' actions constitute a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act, found at 18 U.S.C. §§1961-1968.

As the internet breaks down the geographic and temporal walls that once restricted the flow of information and commerce, plaintiffs argue that several illegitimate businesses have used the medium to further their illegal industries. Plaintiffs allege that "numerous sites have been created to offer the opportunity to engage in illegal gambling on the internet." Bradley Complaint at ¶ 22, Thompson Complaint at ¶ 22. "Many of these sites operate from outside the borders of the United States, but through use of the Internet and interstate telephone lines they can be accessed easily from any computer in the United States with Internet access." Id. Those gambling sites "allow persons with credit card accounts to gamble using their credit cards." Bradley Complaint at ¶ 23, Thompson Complaint at ¶ 23. The credit cards are used to purchase credits which the bettor may then use, or not use, as he pleases. According to the complaints, the process entails one of two methods. An individual may "call and verbally authorize a deposit

---

[2]Since the arguments asserted by the various defendants are substantially similar, for ease of reference the Court shall refer to MasterCard International, Inc., Fleet Bank, Fleet Credit Card Services, Visa International and Travelers Bank as "defendants." When referring solely to MasterCard International Inc. and Visa International Service Association the Court shall use the term "credit card companies." When referring to Fleet Bank, Fleet Credit Card Services and Travelers Bank, the Court shall designate those parties the "issuing banks."

from his or her credit card whereby chips or gambling credit are made available for gambling, or the individual may download his credit card information to the site or may be required to access a web-site embedded in the gambling site which allows the electronic deposit of credit card funds for "chips" or gambling credit." Id. It is the plaintiffs' contention that "[w]hether the gambling is characterized as chips, credits, points, or in other ways, the end result is the same: a charge for gambling losses is submitted on the credit card, and the player is gambling with real money electronically withdrawn from the credit card and paid to the casino to be billed later by the issuer of the credit card." Id.

Each respective credit card company, Visa and MasterCard, "is responsible for the operation and upgrading of its computer payment system. This consumer financial transaction processing system provides authorization, transaction processing, and settlement services for approximately [millions] of merchants worldwide." See Bradley Complaint at ¶ 41, Thompson Complaint at ¶ 37. Each credit card company processes every charge submitted by the millions of merchants, including Internet casinos, and is aware of the allegedly illegal nature of the gambling debt. Id.

Bradley states that he "placed internet gambling wagers" on approximately nineteen different days using seven different internet casino websites. Bradley Complaint at ¶¶ 24-31. Although he pleads that he wagered a total of $16,445, he was charged $7,048 by Visa and Travelers.[3] Bradley Complaint at ¶ 34. On the billing statements, the various transactions were characterized as purchases as opposed to cash advances. Bradley Complaint at ¶ 31. As Bradley

---

[3] Plaintiff does not explain the discrepancy but presumably this indicates that Bradley was not always unsuccessful.

accessed each of the seven different casino websites he was instructed to enter his billing information, including his street address, billing state and country and for each dollar he deposited he received a "gambling credit" whose only purpose was to act as gambling tender. Bradley Complaint at ¶¶ 25-33. The Visa logo was visible on each website as a means of encouraging plaintiff to use his Visa card to place bets. Bradley Complaint at ¶ 25.

Thompson "placed wagers" through two different web sites on approximately 13 different days. Thompson Complaint at ¶¶ 24-27. Thompson pleads that he wagered a total of $1520 and was charged $1510 by MasterCard and Fleet. Thompson Complaint at ¶ 30. As with Bradley, the various transactions were characterized as purchases rather than cash advances on the billing statements. Thompson Complaint at ¶ 28. Thompson also states that as he accessed each website he was instructed to enter his billing information, including his billing state and country and that for each dollar he deposited he received a "gambling credit" whose only purpose was to act as gambling tender. Thompson Complaint at ¶¶ 25-29. In his case, the MasterCard logo was visible on each website as a means of encouraging plaintiff to use his MasterCard to place bets. Thompson Complaint at ¶ 25.

Each plaintiff admits that all internet casinos accept forms of payment other than credit cards. Bradley Complaint at ¶ 37, Thompson Complaint at ¶ 33. However, all other forms of payment required a waiting period for that particular form of payment to clear before a bettor could place a wager. Id. Bradley and Thompson each contend that the casinos' acceptance of their respective credit cards was the most immediate method by which plaintiffs could purchase credits and that "but for" the casinos' acceptance of the plaintiffs credit cards, neither would have placed bets with the internet casinos. Bradley Complaint at ¶ 37, Thompson Complaint at ¶ 33.

7

Plaintiffs allege that the Internet casinos and the defendants have engaged in "a worldwide gambling enterprise" through the transmissions and facilitation of internet casino gambling, sports betting[4] and the collection of gambling debt. Bradley Complaint at ¶ 88, Thompson Complaint at ¶ 77. Through an association with the internet casinos, plaintiffs claim that the defendants "directed, guided, conducted, or participated, directly or indirectly, in the conduct of an enterprise through a pattern of racketeering activity and/or collection of unlawful debt" as defined by RICO, 18 U.S.C. §1961 et seq. Bradley Complaint at ¶ 89, Thompson Complaint at ¶ 78.

In support of these accusations, plaintiffs contend that the defendants' services support "the internet casinos. . . in foreign countries where their presence may be legal" but that they also "actively directed, participated in and aided and abetted [the casinos] bookmaking activities in the United States where they are not legal." Bradley Complaint at ¶ 39, Thompson Complaint at ¶ 35. Thompson supports this accusation by alleging that employees of MasterCard attended an on-line gaming seminar and gave an impromptu presentation explaining MasterCard's role in the internet gambling system. Thompson Complaint at ¶ 40. Bradley supports his claim by alleging that Visa had detailed procedures in place to handle internet gambling transactions. Bradley Complaint at ¶¶ 45-49. It is plaintiffs' contention that the credit card companies know the exact nature of each transaction processed through their international payment system and continue to allow internet gamblers to use their credit cards when defendants knew that internet gambling debts were allegedly illegal. Bradley Complaint at ¶¶ 41-42, Thompson Complaint at ¶¶ 36-37. Plaintiffs do not allege that the defendants received or transmitted any bets or that they

---

[4]The Court notes that neither plaintiff alleges that he placed wagers on sporting events.

8

have an ownership interest in the online casinos.

Plaintiffs bring their suits under 18 U.S.C. § 1964 (c) arguing that the defendants have violated 18 U.S.C. § 1962(c) as well as state law. Plaintiffs support these causes of action with several claims that depend upon a finding that internet gambling is illegal under state and/or federal law, as well as causes of action for mail fraud and wire fraud. With these facts in mind the Court turns to the relevant legal standards.


## II. Standard for Motion to Dismiss

" A motion to dismiss an action for failure to state a claim 'admits the facts alleged in the complaint, but challenges plaintiff's right to relief based upon those facts.'" Crowe v. Henry, 43 F.3d 198, 203 (5th Cir. 1995)(quoting Ward v. Hednell, 366 F.2d 247, 249 (5th Cir. 1966)). "The district court may not dismiss a complaint under rule 12(b)(6) 'unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Collins v. Morgan Stanley Dean Witter, 2000WL 1159321 at *2 (5th Cir. 2000) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). "In order to avoid dismissal for failure to state a claim, however, a plaintiff must plead specific facts, not mere conclusory allegations." Id.; see also Kaiser Aluminum & Chemical Sales v. Avondale Shipyards, 677 F.2d 1045 (5th Cir. 1982). That being said, it is well established that courts do not have to accept every allegation in the complaint as true in considering its sufficiency. Wright & Miller, Federal Practice & Procedure §1357, at 311; see also Associated Builders, Inc. v. Alabama Power Company, 505 F.2d 97, 100 (5th Cir. 1974) (conclusory allegations and unwarranted deductions of fact are not admitted as true). Courts do not have to accept "legal conclusions, " unsupported conclusions,"

9

"unwarranted references,"or "sweeping legal conclusions cast in the form of factual allegations." Wright & Miller at 315-18.

Plaintiffs in RICO claims must "plead specific facts, not mere conclusory allegations which establish the enterprise." Manax v. McNamara, 842 F.2d 808, 811 (5th Cir. 1988). Moreover, a RICO plaintiff must plead the specified facts as to each defendant. It cannot avoid Rule 12(b)(6) by "lumping together the defendants." Goren v. New Vision Int'l, Inc., 156 F.3d 721, 730 (7th Cir. 1988).

## III. RICO Generally

"It is the purpose of [RICO] to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Organized Crime Control Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, 923. "Congress enacted. . . RICO. . .for the purpose of seek[ing] the eradication of organized crime in the United States." Beck v. Prupris, 529 U.S. 494, 496, 120 S.Ct. 1608, 1611 (2000) (internal quotations and citations omitted). To simplify the statute as it applies to the case before this Court, RICO has eight sections, four of which apply directly to the action sub judice. The statute provides a definitional section found at 18 U.S.C. §1961. 18 U.S.C. §1962 (a)-(d) sets forth the four activities prohibited by the statute. "Subsections (a), (b), and (c) were designed to work together to deal with the three different ways in which organized crime infiltrates and corrupts legitimate organizations." David B. Smith & Terrance G. Reed, *Civil RICO*, §5.02, p. 5-2 (Matthew Bender & Co. 2000). Subsection (d) is an

10

inchoate offense, prohibiting conspiracy to violate sections (a), (b), or (c).

Pertinent to this case is §1962(c) which provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which effect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c).   The United States Court of Appeals for the Fifth Circuit has simplified section 1962(c) to mean that "a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity." St. Paul Mercury Insurance Co. v. Williamson, 224 F.3d 425, 439 (5th Cir. 2000).

Section 1963 imposes criminal penalties upon those who violate section 1962. A civil remedy is provided under section 1964, which states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ." 18 U.S.C. §1964(c).

"Common elements are present in all four [RICO] subsections." Crowe v. Henry, 43 F.3d 198, 204 (5th Cir. 1995). "These common elements teach that any RICO claim necessitates "(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct or control of an enterprise." Id. (citing Delta Truck & Tractor, Inc. v. J.I. Case Co., 855 F.2d 241, 242 (5th Cir. 1988); see also Keith A. Langley & Mark Chevallier, Civil RICO, 21 Tex. Tech. L. Rev. 185 (1990). Once those fundamental prerequisites are satisfied, the court "may then continue to the substantive requirements of each respective subsection." St. Paul Mercury Insurance Co. v. Williamson, 224 F.3d 425, 439 (5th

Cir. 2000). In this case, plaintiffs allege an association in fact enterprise in violation of §1962(c) and as such, they must also plead that the association in fact enterprise (1) has an existence separate and apart from the pattern of racketeering, (2) is an ongoing organization and (3) functions as a continuing unit as shown by a hierarchal or consensual decision making structure. Crowe v. Henry, 43 F.3d 198, 205 (5th Cir. 1995); Elliot v. Foufas, 867 F.2d 877, 881 (5th Cir. 1989).

The Court will resolve this dispute in a cartesian manner. The Court's substantive RICO analysis will first address those elements common to all RICO claims: the existence of a RICO person, a pattern of racketeering activity, and the existence of an enterprise. Next, the Court will address those requirements discrete to alleged violations of 18 U.S.C. §1962 (c), including whether that section encompasses aiding and abetting liability. Finally, the Court will discuss standing. Although standing is generally a threshold question, in this case it is more appropriately analyzed last because RICO standing is dependant upon first finding a violation of section 1962, and then determining whether that violation caused plaintiffs' injuries.

## IV. Elements Common to All RICO Claims

### A. RICO Person

A RICO person is the defendant. Crowe v. Henry, 43 F.3d 198, 204 (5th Cir. 1995); In re Burzynski, 989 F.2d 733, 742 (5th Cir. 1993). 18 U.S.C. §1961(3) defines a RICO person as "any individual or entity capable of holding a legal or beneficial interest in property." Recognizing that the statute provides a very broad definition, the United States Court of Appeals for the Fifth Circuit has added a gloss to that definition , requiring that "the RICO person must be one that

12

either poses or has posed a continuous threat of engaging in the acts of racketeering." Crowe v.
Henry, 43 F.3d 198, 204 (5th Cir. 1995)(quoting Delta Truck& Tractor, Inc. v. J.I. Case Co., 855
F.2d 241, 242 (5th Cir.), cert. denied, 489 U.S. 1079 (1989)). The panel in Crowe expounded
upon the requirement by stating that "[t]he continuous threat requirement may not be satisfied if
no more is pled than that the person has engaged in a limited number of predicate racketeering
acts." Id.

    Plaintiffs alleged that the defendants have engaged in the predicate acts for at least a year
and that they continue to engage in the same course of conduct. Taking those facts as true for the
purposes of these motions, the Court finds that plaintiffs have adequately alleged the existence of
RICO persons.


### B. Pattern of Racketeering Activity

    As stated above, a prerequisite to the RICO action is that there be a pattern of
racketeering activity. 18 U.S.C. §1961(5) defines a pattern of racketeering activity as "two acts
of racketeering activity. . . ." 18 U.S.C. §1961(5). "Plaintiffs [ in a RICO action] must identify
and prove a pattern of racketeering activity, defined as two "predicate acts" of racketeering
activity within a 10 year period." Langford v. Rite Aid of Alabama, Inc., 231 F.3d 1308, 1311-
12 (11th Cir. 2000). Therefore, "[i]n order to make out a RICO claim, [plaintiffs] first must
show that the [defendants] committed the predicate acts enumerated by RICO." Grant, Inc. v.
Greate Bay Casino Corp., 232 F.3d 173, 184 (3rd Cir. 2000). In other words, "[a] pattern of
racketeering activity requires two or more predicate acts and a demonstration that the
racketeering predicates are related and amount to or pose a threat of continued criminal activity."

St. Paul Mercury Insurance Comp. v. Williamson, 224 F.3d 425,441 (5th Cir. 2000)(citing

Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer, 90 F.3d 118, 122 (5th Cir.1996)).

The RICO statute proscribes categories that constitute racketeering activity. The first category

consists of certain generically enumerated state law offenses that are "chargeable under State law

and punishable by imprisonment for more than one year." 18 U.S.C. §1961(1)(A). The second

group of offenses includes specific offenses indictable under the federal criminal code, found at

Title 18 of the United States Code . 18 U.S.C. §1961(1)(B). The third group entails certain labor

related acts indictable under the Title 29 of the United States Code. 18 U.S.C. §1961(1)(C). The

final category consists of offenses involving securities fraud and narcotics transactions. 18

U.S.C. §1961(1)(D).

In this case, plaintiffs' allegations arise under sections 1961(1)(A) and 1961(1)(B).

Plaintiffs' (1)(A) allegations are that the defendants violated gambling laws that are chargeable

under state law and punishable by imprisonment of more than one year. In plaintiff Thompson's

case, he alleges violations of Kan. Stat. Ann. §§60-1704, 21-4302, 21-4304 and 21-3104. In

plaintiff Bradley's case, he alleges violations of N.H. Rev. Stat. Ann. §§491:22, 338:1, 338:2

and 338:4. As to their claims under §1961(1)(B), plaintiffs claim violations of 18 U.S.C.

§1084(a) ('The Wire Act"); 18 U.S.C. §1952 ('The Travel Act"); 18 U.S.C. §1955 (Prohibition

of Illegal Gambling Business); 18 U.S.C. §1957 (Engaging in Monetary Transactions in Property

Derived from Specified Unlawful Activity); and 18 U.S.C. §1960 (Prohibition of Illegal Money

Transmitting Business). There are currently no federal statutes addressing Internet gambling.

It is the defendants' argument that both plaintiffs failed to sufficiently allege a violation

of any predicate act listed in the complaint. As such they argue that plaintiffs cannot satisfy a

14

RICO prerequisite and that plaintiffs' case should be dismissed accordingly. Plaintiffs' response is that internet gambling violates the several federal and state statutes as alleged in the complaint. Thus, in order to establish that plaintiffs' have established a crucial RICO prerequisite, the Court turns to the alleged underlying offenses.

### 1. State Law Claims

#### a. New Hampshire Claims

Plaintiff Bradley alleges several violations of New Hampshire state law. However, all four statutes cited by plaintiff are civil statutes. Logically, then, a violation of the civil statutes cited by plaintiff are not "chargeable under state law and punishable by imprisonment of more than one year", and thus do not qualify as a predicate act to establish a pattern of racketeering activity under 18 U.S.C. §1961(1)(A).

#### b. Kansas Claims

Plaintiff Thompson has alleged violations of Kansas Statutes Annotated 60-1704, 21-4302, 21-4304, and 21-3104. Of the four statutes, three are insufficient on their face to qualify as a predicate act under RICO, which as stated above requires an act "chargeable under state law and punishable by imprisonment of more than one year." Section 21-3104 is not a substantive criminal statute and merely sets forth the geographic reach of Kansas' substantive criminal law. Section 60-1704 is a procedural statute dealing with civil declaratory judgements. Gambling activity is the subject matter of section 21-4303, but only imposes class B nonperson misdemeanor penalties. Kan. Stat. Ann. 21-4303(b). Under Kansas law, a class B nonperson

misdemeanor carries a penalty that "shall not exceed six months." Kan. Stat. Ann. 21-4502 (1)(b). As the misdemeanor penalty falls short of the "more than one year" requirement under 18 U.S.C. § 1961(1)(A), an alleged violation of Kan. Stat. Ann. 21-4502 cannot be a predicate act under RICO. However, the Kansas Criminal Code does establish a felony offense for commercial gambling under Kan. Stat. Ann. §21-4304. The law establishes four activities as felony offenses, namely (1) operating or receiving all or part of the earnings of a gambling place, (2) receiving, recording or forwarding bets, (3) becoming a custodian of anything of value bet or offered to be bet, (4) conducting a lottery, or (5) setting up for use or collecting the proceeds of any gambling device. Kan. Stat. Ann. 21-4304. Although there are no cases applying the statute to internet gambling, plaintiff cites an opinion issued by the Kansas Attorney General, purporting to deal with the factual scenario before this Court, to support his claims.

Keeping in mind that the Kansas Supreme Court has stated that "[a]n attorney general's opinion is neither conclusive nor binding on us", Unified School Dist. No. 501 v. Baker, 6 P.3d 848, 849 (Kan. 2000) and that such an opinion is merely "persuasive authority", Id. , the Court addresses plaintiff's argument. The Kansas Attorney General addressed the issue of "legality of gambling over the internet." Kan. Atty. Gen. Op. No. 96-31, 1996 WL 156795 (3/25/96). The attorney general opined that "placing, receiving or forwarding a bet, or conducting a lottery, over the telephone or the internet is illegal." Id. at *2. It also stated that "if a bet is placed or a lottery entered into via a computer located in the state of Kansas. . . [then] the crime may be prosecuted in this state." Id. The Court must consider this opinion and the statutory language upon which it is based, remembering that "Kansas courts are required to strictly construe penal statutes in favor of the accused." State v. Hall, 14 P.3d 404, 405 (Kan. 2000). The relevant statute, Kan. Stat.

Ann. 21-4304, makes five commercial gambling activities felony offenses. The only activity remotely applicable to the instant case is section (e) , which makes it a felony to "set[] up for use or collect[] the proceeds of any gambling device." Kan. Stat. Ann. 21-4304(e). As applied to the complaint, plaintiff makes no allegation that either the credit card company or issuing bank collected the proceeds of a gambling device. What plaintiff does state is that he purchased credits using his credit card before he gambled. See Thompson Complaint at ¶¶ 23-29. It is a temporal impossibility for the defendants to have completed their transaction with the plaintiff before he gambled and to then be prosecuted for collecting the proceeds of a gambling device, which can only take place after some form of gambling is completed. This analysis is in accord with the Attorney General's opinion, which clearly does not address the conduct alleged against the credit card companies or banks in this case. Indeed, the activities encompassed by the opinion are those of the bettors, the plaintiff here, and the internet casinos, who have not been made a party to this suit. Thus, Thompson has failed to allege that the defendants violated Kansas law.

As the Court is satisfied that plaintiffs have failed, as a matter of law, to state a cause of action against any defendant for violation of state law, the Court turns to the applicable federal statutes.

### 2. The Wire Act

When interpreting a statute, a court looks first to the language of the statute. Richardson v. United States, 526 U.S. 813, 818, 119 S.Ct. 1707, 1710 (1999). "Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language." Salinas v. United States, 522 U.S. 52, 57, 118 S.Ct. 469, 474 (1997). "[O]nly the most

17

extraordinary showing of contrary intentions in the legislative history will justify a departure

from that language." Id.

The Wire Act, found at 18 U.S.C. §1084 provides in pertinent part as follows,

> (a)  Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any **sporting event or contest** , or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under his title or imprisoned. . . .

18 U.S.C. §1084(a) (emphasis added).  Section (b) of the statute carves out an exception to the

rule,  instructing that the Wire Act shall not "be construed to prevent the transmission in

interstate or foreign commerce of information for use in news reporting of **sporting events or**

**contests**" from a state or country where betting on the sporting event or contest is legal to

another state or country where such betting is legal."  18 U.S.C. §1084(b) (emphasis added).

The defendants argue that plaintiffs' failure to allege sports gambling is a fatal defect with

respect to their Wire Act claims, while plaintiffs strenuously argue that the Wire Act does not

require sporting events or contests to be the object of gambling.  However, a plain reading of the

statutory language clearly requires that the object of the gambling be a sporting event or contest.

Both the rule and the exception to the rule expressly qualify the nature of the gambling activity as

that related to a "sporting event or contest."  See 18 U.S.C. §§1084 (a) & ( b).  A reading of the

caselaw leads to the same conclusion.  See United States v. Kaczowski, 114 F.Supp.  2d 143,

153 (W.D. N.Y. 2000) (Wire Act "prohibits use of a wire communication facility for the

transmission in interstate or foreign commerce of bets or wagers or information assisting in the

18

placing of bets or wagers on any sporting event or contest"); United States v. Sellers, 483 F.2d

37, 45 (5th Cir. 1973)(overruled on other grounds in United States v. McKeever, 905 F.2d 829

(5th Cir. 1990))("the statute deals with bookmakers"); U.S. v. Marder, 474 F.2d 1192,1194 (5th

Cir. 1973 ) (first element of statute satisfied when government proves wagering information

"relative to sporting events").

As the plain language of the statute and case law interpreting the statute are clear, there is

no need to look to the legislative history of the Act as argued by plaintiffs. See In re Abbott

Laboratories, 51 F.3d 524, 528 (5th Cir. 1995). However, even a summary glance at the recent

legislative history of internet gambling legislation reinforces the Court's determination that

internet gambling on a game of chance is not prohibited conduct under 18 U.S.C. §1084. Recent

legislative attempts have sought to amend the Wire Act to encompass "contest[s] of chance or a

future contingent event not under the control or influence of [the bettor]" while exempting from

the reach of the statute data transmitted "for use in the new reporting of any activity, event or

contest upon which bets or wagers are based." See S.474, 105th Congress (1997). Similar

legislation was introduced the 106th Congress in the form of the "Internet Gambling Prohibition

Act of 1999." See, S. 692, 106[th] Congress (1999). That act sought to amend Title 18 to prohibit

the use of the internet to place a bet or wager upon "a contest of others, a sporting event, or a

game of chance. . ." Id. As to the legislative intent at the time the Wire Act was enacted, the

House Judiciary Committed Chairman explained that "this particular bill involves the

transmission of wagers or bets and layoffs on horse racing and other sporting events." See 107

Cong. Rec. 16533 (Aug. 21, 1961). Comparing the face of the Wire Act and the history

surrounding its enactment with the recently proposed legislation, it becomes more certain that the

Wire Act's prohibition of gambling activities is restricted to the types of events enumerated in the statute, sporting events or contests. Plaintiffs' argument flies in the face of the clear wording of the Wire Act and is more appropriately directed to the legislative branch than this Court.

In the context of a Rule 12(b)(6) motion, then, the Court must look to the allegations in the complaints to determine if "the complaint lacks an allegation regarding a required element necessary for relief." Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir.1995) citing 2A Moore's Federal Practice, ¶ 12.07[2.-5] at 12-91; Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). The parties make several allegations that they placed bets at internet casino sites. See e.g., Thompson complaint at ¶¶ 24, 25, 54, Bradley complaint at ¶¶ 24, 26. Plaintiffs fail to allege the identity of the games that they played, i.e. games of chance or sports related games. Pleading such matters is critical when their right to relief hinges upon the determination of whether Internet casino gambling is legal. That being said, the Court cannot simply assume that plaintiffs bet on sporting events or contests when they make no such allegation in their otherwise extremely thorough complaints.

The sole reference to "sports betting" is a conclusory allegation that the alleged enterprise engaged in sports betting. See Bradley petition at ¶ 88, Thompson petition at ¶ 77. However, nowhere does either plaintiff allege personal participation in sports gambling. Such an allegation is not enough to survive a motion to dismiss where there is no claim that plaintiffs themselves, or the defendants they have sued, participated in sports gambling. Since plaintiffs have failed to allege that they engaged in sports gambling, and internet gambling in connection with activities other than sports betting is not illegal under federal law, plaintiffs have no cause of action against

20

the credit card companies or the banks under the Wire Act.[5]

### 3. Mail and Wire Fraud

Plaintiffs also allege violations of the federal mail and wire fraud statutes. As to mail

fraud, plaintiffs alleged that the defendants mailed billing statements, some of which were paid,

both acts taking place via the United States Postal Service. See Thompson Complaint at ¶¶ 87-

89, Bradley Complaint at ¶¶ 98-100. With respect to wire fraud, plaintiffs allege that defendants

opened and authorized merchant accounts and thereafter authorized, cleared, transmitted,

approved, paid and collected electronic purchases of bets. See Thompson Complaint at ¶ 90,

Bradley Complaint at ¶101.

Although each allegation applies to different defendants, plaintiffs' mail fraud and

wired fraud allegations can be analyzed together because "[t]he Supreme Court has said that

because the mail and wire fraud statutes share the same language in relevant part, the same

analysis applies to each." United States v. Mills, 199 F.3d 184, 188(5th Cir. 1999) (citing

Carpenter v. United States, 484 U.S. 19, 25 n.6 (1987)). "To prove mail fraud pursuant to 18

U.S.C. §1341, the government must prove: (1) a scheme to defraud, (2) which involves the use

of the mails, (3) for the purpose of executing the scheme." United States v. Gray, 96 F.3d 769

(5th Cir. 1996). "To prove wire fraud pursuant to 18 U.S.C. §1343, the government must prove,

---

[5]Since plaintiffs have not alleged a substantive violation of the Wire Act, the Court need
not consider the issue of whether the credit card companies or issuing banks are "engaged in the
business of betting or wagering', a condition to Wire Act liability. The Court does note that
according to the Fifth Circuit Pattern Criminal Jury Instructions, the first finding necessary to
impose liability is that "the defendant was in the business of betting or wagering. By this I mean
the defendants was prepared on a regular basis to accept bets placed by others– that is, the
defendant was a bookie." Pattern Jury Instructions (Criminal Cases)-- Fifth Circuit §2.50 (West
1990).

(1) a scheme to defraud, (2) the use of, or causing the use of, wire communications in furtherance of the scheme." Id. As to scienter, "both RICO mail and wire fraud require evidence of intent to defraud, i.e., evidence of a scheme to defraud by false or fraudulent representations." St. Paul Mercury Insurance Co. v. Williamson, 224 F.3d 425, 441 (5th Cir. 2000).

Since the Court finds that the Wire Act does not prohibit internet casino gambling or defendants' association therewith, there can be no mail or wire fraud. Plaintiffs' fraud claims depend upon a finding that the gambling activities and debts were in violation of U.S. and state law and that the defendants therefore misrepresented the debts as legal, as explained in the previous sections. However, plaintiffs' attempt to advance this theory fails because the debts themselves are not illegal. Moreover, even if the debts were illegal, defendants' representations with respect to those debts do not provide a basis for a mail or wire fraud claim because "[i]t is the general rule that fraud cannot be cannot be predicated upon misrepresentations of law." See Meacham v. Halley, 103 F.2d 967, 971 (5th Cir. 1939); see also Allen v. Westpoint-Pepperel, Inc., 945 F.2d 40 (2d Cir. 1991).

A second fundamental defect with respect to claims of mail fraud and wire fraud is that plaintiffs have failed to comply with Federal Rule of Civil Procedure 9(b), which requires that fraud be plead with particularity, specifically alleging "the time, place and contents of the false representations." See Truchman v. DSC Corp., 14 F.3d 1061, 1068 (5th Cir. 1994). Rule 9(b)'s particularity requirement applies to pleading fraud as a predicate act in a RICO claim. Tel-Phonic Servs., Inc. v. TBS Int'l, Inc., 975 F.2d 1134, 1138 (5th Cir.1992). Such specificity is critical considering that the content of the billing statements in large part determines whether or not the representations are fraudulent. Plaintiffs' allegations lump together the defendants and do not

specifically allege what action was taken by each entity, a crucial error considering the very representations absent from the complaint are those relied upon by the plaintiffs to support their claims.

Regardless, even if plaintiffs alleged facts with specificity, the allegations that the issuing banks represented the credit charges as legal debts is not a scheme to defraud. The billing statements received by plaintiffs indicated that plaintiffs owed a certain sum for credits purchased, the amount of which is not disputed by plaintiffs. As this Court has decided that the act of making those credits available is not a violation of law, the debts are legal and enforceable.

Plaintiffs fraud claims also fail as the complaints fail to allege any reliance upon the representations made by defendants, as required by Fifth Circuit law under <u>Summit Properties, Inc. v. Hoechst Celanese Corp.</u>, 214 F.3d 556, 562 (5th Cir. 2000). According to <u>Summit</u>, the reliance requirement does not arise from the mail and wire fraud statutes themselves, but from cognates of proximate causation that are necessary to invoke any civil action for §1962(c) violations. For that reason, the reliance requirement will be discussed more in depth when the Court discusses whether defendants have standing to assert a civil cause of action. Regardless of where the analysis takes place, plaintiffs' failure to allege reliance is fatal to their fraud claims as a matter of law.

**4. Other Federal Laws**

As far as violations of other federal laws are concerned, the finding that defendants' activities did not violate The Wire Act or other law moots any other federal cause of action. As defendants have not violated the Wire Act, Mail Fraud, Wire Fraud or applicable state statutes, defendants can have no liability under other federal laws. Therefore, the Court will dispose of

23

these claims in a summary fashion.

Plaintiffs allegations with respect to 18 U.S.C. §1957, 18 U.S.C. §1952, and 18 U.S.C. §1955 are quite ephemeral, there simply is no cause of action for those crimes unless the defendants committed an unlawful activity in violation of some other state or federal law.[6] As plaintiffs have failed to allege that defendants' activities are illegal, this case presents no other cause of action under Title 18 that can be a predicate act under RICO.

### 5. Collection of Unlawful Debt

A stated above, section 1962(c) also makes it unlawful "for any person through a pattern of racketeering activity **or** through a collection of unlawful debt to acquire or maintain , directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. §(c)(emphasis added).  The language clearly indicates that in formulating RICO, Congress created an alternative means to trigger the statute aside from engaging in a pattern of racketeering activity – that is,  collection of an unlawful debt.  Therefore, in most cases,  discussion of the alleged collection of an unlawful debt would be most appropriately positioned as an alternative, separate section apart from the averments concerning the pattern of racketeering activity.  However, because the factual bases for each allegation is the same, the Court will discuss the allegation in this section of the opinion.

Although "[r]elatively few RICO prosecutions and even fewer civil RICO cases have charged collection of an unlawful debt instead of a pattern of racketeering activity", David B. Smith & Terrance G. Reed, *Civil RICO*, §4.05, p. 4-765 (Matthew Bender & Co. 2000), plaintiffs

---

[6]Plaintiffs also allege a violation of 18 U.S.C. §1960.  However, even if such a violation were alleged, it is not a RICO predicate act under 18 U.S.C. §1961(1).

24

in this case have done so.   Section 1961 defines two categories of unlawful debt.  The first

category of unlawful debt is debt incurred or contracted in a gambling activity illegal under state

or federal law, or those debts unenforceable under federal or state usury law.  18 U.S.C.

§1961(6)(A).  The second category are those debts incurred in connection with the business of

gambling in violation of federal or state law or the business of lending money or a thing of value

at usurious rates, where those rates are at least double the enforceable rates.  18 U.S.C.

§1961(6)(B).

Neither plaintiff has alleged usury, and the Court has already decided that defendants'

activities have not violated state or federal law.  Accordingly, plaintiffs fail to allege the

collection of unlawful debt as defined in 18 U.S.C. §1961(6)(A)or (B).

In the final analysis, plaintiffs are unable to allege that Visa, MasterCard, Travelers or

Fleet engaged in a pattern of racketeering activity as defined by 18 U.S.C. §1961.  As such,

plaintiffs have failed to satisfy a necessary prerequisite to the RICO action.  Accordingly, their

RICO claims must be dismissed.  However, because the complaints fail in several other

important respects as well, the Court will proceed to analyze the remaining elements of the RICO

cause of action.


### C. Enterprise

#### 1. Generally

The final element common to all RICO claims is the existence of an enterprise.   Thus,

"[a] plaintiff asserting a RICO claim must allege the existence of an enterprise."  Crowe v.

Henry, 43 F.3d 198, 204 (5th Cir. 1995) (citing Montesano v. Seafirst Commercial Corp., 818

F.2d 423, 427 (5th Cir. 1987)). A RICO enterprise is "a group of persons associated together for a common purpose" and "is proved by evidence of an ongoing organization. . .and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528 (1981). The statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4). Thus, a RICO enterprise can either be a legal entity or an association in fact. St. Paul Mercury Insurance Co. v. Williamson, 224 F.3d 425, 439 (5th Cir. 2000); Manax v. McNamara, 842 F.2d 808, 811 (5th Cir. 1988).

As previously noted, plaintiffs have alleged an association in fact enterprise consisting of the on-line casinos, the credit card companies and the issuing banks. See Bradley Complaint at ¶ 88 ("the Internet casino(s), VISA International and Travelers have formed a worldwide gambling enterprise"), Thompson Complaint at ¶ 77 ("the Internet Casino(s), MasterCard and Fleet Bank have formed a worldwide gambling enterprise"). It is permissible under the statute for a group of legal entities, such as corporations, to constitute an association in fact enterprise. United States v. Blinder, 10 F.3d 1468, 1473 (9th Cir. 1993). According to the complaints, the enterprises' purpose is to facilitate internet casino gambling, sports betting and the collection of gambling debt through United States telephone lines and the United States mail. See Bradley Complaint at ¶ 88, Thompson Complaint at ¶ 77.

"While a RICO enterprise can be formal or informal, some type of organizational structure is required." Stachon v. United Consumers Club, Inc., 229 F.3d 673, 675 (7th Cir. 2000). The Fifth Circuit has determined that an "association in fact" enterprise (1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing

organization, and (3) its members must function as a continuing unit as shown by a hierarchal or consensual decision making structure." Crowe v. Henry, 43 F.3d 198, 205 (5th Cir. 1995)(citations omitted).

### 2. Existence Separate and Apart From the Pattern of Racketeering

"The question of whether the enterprise has a "separate existence" from the pattern of activity through which it is conducted ought to be the focus of inquiry in every illegitimate enterprise case." David B. Smith & Terrance G. Reed, *Civil RICO*, §3.06, p. 3-50 (Matthew Bender & Co. 2000) The United States Supreme Court has instructed that "[t]he "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages." United States v. Turkette, 452 U.S. 576,583, 101 S.Ct. 2524, 2529 (1981); see also Elliot v. Foufas, 867 F.2d 877, 881 (5th Cir. 1989). Therefore, proof of a pattern of racketeering does not necessarily prove the existence of an enterprise, and vice versa. Id. Moreover, "the plaintiff must plead specific facts which establish that the association exists for purposes other than simply to commit the predicate acts." Elliot v. Foufas, 867 F.2d 877, 881 (5th Cir. 1989). "If the association has as its *raison d'etre* a single, discrete goal toward which all its energies are directed, the association is not a RICO enterprise." Household Bank FSB v. Metro Associates, 1992 WL 350239 at *1 (E.D. La. 1992).

Here, plaintiffs allege separateness between the enterprise and the pattern of racketeering activity. See Bradley Complaint at ¶ 92, Thompson Complaint at ¶ 81. More precisely, plaintiffs plead that the defendants' activities with respect to activities legal under United States law and their activities with respect to Internet gambling from jurisdictions outside the United States are

activities that are separate and apart from the alleged racketeering activities. <u>See</u> Bradley Complaint at ¶ 92(a) & (b), Thompson Complaint at ¶ 81 (a) & (b). Here, the enterprise consists of three parties: the Internet casino, the credit card company, and the issuing bank. What that alleged enterprise does is make casino gambling available on the Internet and provide a means to obtain virtual cash to use at the casinos.

The United States Court of Appeals for the Eighth Circuit formulated a succinct test to determine whether or not the alleged enterprise is indeed distinct from the pattern of racketeering activity. That court stated "[i]n assessing whether an alleged enterprise has an ascertainable structure distinct from that inherent in a pattern of racketeering, it is our normal practice to determine if the enterprise would still exist were the predicate acts removed from the equation." <u>Handeen v. Lemarie</u>, 112 F.3d 1339, 1352 (8th Cir. 1997); <u>see e.g.</u>, <u>Bank v. Brooklyn Law School</u>, 2000 WL 1692844 at *4 (S.D.N.Y. 2000)(plaintiff failed to allege that enterprise exited separate and apart from pattern of racketeering when there was no allegation that the enterprise would exist were the predicate acts removed from the equation). The Fifth Circuit adheres to a similar analysis. <u>See</u>, <u>e.g.</u> <u>Crowe v. Henry</u>, 43 F.3d 198, 205 (5th Cir. 1995)(finding that alleged enterprise did exist separate and apart from the pattern of racketeering when the enterprise extended beyond the alleged predicate acts of fraud and theft); <u>Landry v. Airline Pilots Assoc.</u>, 901 F.2d 404 (5th Cir. 1990) (when only purpose is to commit predicate acts, enterprise does not exist separate and apart from the pattern of racketeering activity); <u>Ocean Energy II, Inc. v. Alexander & Alexander, Inc.</u>, 868 F.2d 740, 748 (5th Cir.1989)(association in fact enterprise must have an ongoing organization or be a continuing unit, such that the enterprise has an existence that can be defined apart from the commission of the predicate acts).

The analysis then is, assuming that internet casinos' and the defendants' actions qualified as a pattern of racketeering, which they do not, would the enterprise continue to exist if the acts of racketeering ceased. The answer is yes. In the context of a motion to dismiss, taking plaintiffs' allegations that the enterprise conducted worldwide gambling as true, the question is whether worldwide gambling activity would cease were the alleged violations of the Wire Act, fraud and other federal statutes terminated. If that were the case, Internet gambling would certainly be unavailable for United States citizens placing bets from this country. However, the worldwide gambling enterprise, as alleged, would continue without interruption. To analyze the separateness requirement by activity, rather than by practical application would lead to absurd results. For example, if one merely looked to the type of activity, drug dealers or smugglers who sell their products in violation of United States law, but also sell the identical products legally in other countries would be immune from RICO liability. The Court seeks to avoid such an absurd result. Although the activity, internet gambling, is the same wherever it is available, it is undisputed that were it declared illegal and banned in the United States, the activity would continue in other parts of the world. Thus the enterprise continues, and the distinctness requirement is met.

As stated above, the remaining two requirements necessary to establish an association in fact enterprise are an ongoing organization, and a hierarchal or consensual decision making structure. Because the analysis of these two factors is based on substantially the same overlapping facts, the Court will analyze the remaining two elements together.

### 3. Ongoing Organization and Hierarchal or Consensual Decision Making Structure

An association in fact must, inter alia, meet a continuity requirement demonstrating that "its members. . .function as a continuing unit shown by hierarchal or consensual decision making structure." Landry v. Airline Pilots Assoc. International AFL-CIO, 901 F.2d 404, 433 (5th Cir. 1990). Indeed, "the hallmark of an enterprise is a structure." United States v. Korando, 219 F.3d 1114, 1117 (7th Cir. 1994). The enterprise must also have "a common or shared purpose and continuity of structure and personnel." Succession of Wardlaw v. Whitney National Bank, 1994 WL 577442 at *3 (E.D. La. 1994) (quoting Shaffer v. Williams, 794 F.2d 1030, 1032 (5th Cir. 1986)). Where the alleged enterprise consists of multiple sub-groups, "what is necessary is evidence of systematic linkage, such as overlapping leadership, structural or financial ties, or continuing coordination." United States v. Owens, 167 F.3d 739, 751 (1st Cir 1999)(quoting Libertad v. Welch, 53 F.3d 428, 433 (1st Cir. 1995)).

Taking the complaints as true, the defendants "share[] the common purpose of monetary gain from Internet gambling." Bradley Complaint at ¶ 91, Thompson Complaint at ¶ 80. To carry out this purpose, the credit card companies contract with millions of merchants worldwide to allow usage of their payments processing systems. The credit card companies also contract with the issuing banks to permit the bank's customers to purchase goods from credit card associated merchants. The issuing banks then issue credit cards to their customers. Whether a customer uses a particular credit card issued by a particular bank at a particular merchant is a fortuity. In other words, a consumer is essentially free to use any credit card at any location worldwide. Although the issuing banks and credit card companies have standing agreements to permit card

30

usage at a particular location, there is no ongoing organization. The confluence of merchant,

issuing bank and credit card company is in the hands of the consumer, not the defendants. It is

the consumer who decides to use a particular card; it is the merchant who decides how to carry

out his business and whether to abide by the applicable law. It is the issuing banks and credit

cards who ensure that the system flows smoothly, their services may be required several times a

day, or not at all. Plaintiffs have alleged a random intersection, not an ongoing organization.

Plaintiffs' allegations hardly establish "an organizational pattern or system of authority that

provides a mechanism for directing the groups affairs on a continuing, rather than ad hoc, basis."

United States v. Tocco, 200 F.3d 401, 425 (6th Cir. 2000)(citations omitted).

With respect to the structure of the enterprise, plaintiffs make the bald assertion that

"[t]he Enterprise has and had an ascertainable structure, and a continuity of structure and

personnel." Bradley Complaint at ¶ 94, Thompson Complaint at ¶ 83. Without any further

supporting facts, the Court finds that there is no hierarchal or decision making structure in the

alleged enterprise. See Broyles v. Wilson, 812 F.Supp. 651 (M.D. La. 1993) (motion to dismiss

granted when plaintiff fails to allege any facts showing any structure whatsoever); Arnette v.

Bankers Trust Company of Louisiana, 1987 WL 25135 at *1 (E.D. La. 1987) ("[p]laintiff's

conclusory assertion that "[t]he enterprise had an ongoing organization, with associates

functioning as a continuing unit; a consensual or hierarchal structure for group decision making;

a common or shared purpose, and continuity of structure and personnel" merely parrots the

Shaffer criteria. [Therefore] Plaintiff has failed to plead facts to establish the existence of an

enterprise").

In 800537 Ontario, Inc. v. Auto Enterprises, Inc., 113 F.Supp. 2d 1116 (E.D. Mich.

31

2000), plaintiff instituted a RICO suit against defendants arising from the defendants' practice of obtaining tax refunds from the Canadian government for taxes that were never paid. Id. at 1118-19. The following were alleged to have occurred between two auto importers, World Imports and Auto Enterprises. Auto Enterprises imported 98% of World Imports' vehicles; Auto Enterprises was given power of attorney by World Importers; Auto Enterprises facilitated the movement of World Imports vehicles through U.S. Customs, and ; Auto Enterprises provided all necessary customs paperwork. Id. at 1122. The court held that "[t]he mere fact that Defendant World Imports and Defendant Auto Enterprises have engaged in a business relationship is insufficient to establish that Defendants functioned as a continuous unit for Rico purposes." Id. at 1123 (internal quotations omitted). The court decided that "[n]one of the allegations in the amended complaint support the conclusion that the World Import Defendants and the Auto Enterprise Defendants participated in any type of hierarchy beyond their contractual relationship." Id. Therefore the court granted defendant's motion to dismiss.

Plaintiffs in this case fall short of alleging the level of interaction seen in Auto Enterprises. Aside from the fact that the defendants' conducted a normal business relationship, there has been no factually supported allegation regarding any type of hierarchy beyond the fundamental business relationship.

In Jubelirer v. MasterCard International, Inc., 68 F.Supp. 2d 1049 (W.D. Wisc. 1999), the court was presented with an identical factual scenario. The plaintiff asserted a civil RICO claim against MasterCard and an issuing bank claiming that they formed an association in fact enterprise with an on-line casino. Id. In finding that plaintiff failed to allege an association in fact enterprise, the court reasoned that "[a]ccepting plaintiff's allegations as sufficient to allege a

32

RICO enterprise would lead to the absurd conclusion that each of the many million combinations of merchant, [credit card company], and lender is a RICO enterprise." Id. at 1053. The court held that an "enterprise must be more than a routine contractual combination for the provision of financial services." Id. at 1053. Thus, there can be no finding of a hierarchal or consensual decision making structure, or an ongoing organization when "[e]ach party conducts its own affairs which include certain contracts for services with others." Id.

This case is no different than Jubelirer. To the extent that plaintiffs' pleadings differ from Jubelirer, it is in the form of legal conclusions, unwarranted deductions of fact, and mere recitations of the applicable statutes. Therefore, this Court finds that the very nature of the business alleged by plaintiffs requires a finding that there is no ongoing organization or hierarchal or consensual decision making structure among the Internet casinos, the credit card companies and the issuing banks. See also Okaya v. Denne Industries, Inc., 2000 WL 1727785 (N.D. Ill. 2000) (no enterprise when complaint fails to allege a hierarchal organization with differentiating roles and does not provide any explanation for defendants actions other than their own self interest); See generally, Stachon v. United Consumers Club, Inc., 1999 WL 971284 at *4 (N.D.Ill. 1997) (motion to dismiss granted when plaintiff alleges that defendants entered into business agreements because "nothing within. . .ordinary business relationships mirrors a hierarchal organization"). Plaintiffs' failure to plead an ongoing organization evidenced by a hierarchal or consensual decision making structure is yet another defect fatal to their RICO claim.

Thus, of the three RICO prerequisites necessary to establish any claim, plaintiffs' have failed to allege two, a pattern of racketeering activity and an enterprise. The Court will now move on to analysis discrete to section 1962(c) claims.

33

## V. Liability Unique to §1962(c)

### A. Conduct

"Section 1962(c), the most often charged RICO offense, was intended to prevent the operation of a legitimate business or union through racketeering." David B. Smith & Terrance G. Reed, *Civil RICO*, §5.01, p. 5-2 (Matthew Bender & Co. 2000).  18 U.S.C. §1962(c) imposes liability to a discrete group, i.e. those who "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  The Court has narrowly interpreted the term "conduct" to hold liable only those individuals who "participate in the operation or management of the enterprise itself." Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S.Ct. 1163, 1173 (1993); See also Bachman v. Bear, Stearns & Company, Inc., 178 F.3d 930, 932 (7th Cir. 1999) (to conduct the affairs of an enterprise, there must be at least some measure of control over the enterprise).   A defendant need not be upper level management to satisfy the operation or management test, rather a defendant may participate in the conduct of an enterprise "by knowingly implementing decisions, as well as by making them." MCM Partners, Inc. v. ·Andrews-Bartlett & Associates, Inc., 62 F.3d 967, 978 (5th Cir. 1995) ( citing United States v. Oreto, 37 F.3d 739, 750 (1st Cir.1994)).

Plaintiffs aver the following to demonstrate the relationship between the defendants and the Internet casinos.  They allege that "the RICO enterprise includes [the credit card companies] and [the issuing banks] who were and are associated with the aforementioned Internet casino(s) and directed, guided, conducted and/or participated directly or indirectly, in the conduct of the enterprise. . . ." Bradley Complaint at ¶ 89, Thompson Complaint at ¶ 78.  With respect to the

34

credit card companies, plaintiffs state that Visa and MasterCard "[have] allowed [their] name[s] and emblem[s] to be used for Internet gambling in supporting the enterprise for more than a year and ha[ve] actively directed, supervised, guided, educated, financed, participated in and funded this gambling enterprise." Bradley Complaint at ¶ 90, Thompson Complaint at ¶ 79. According to plaintiffs' "[the credit card companies] and [the issuing banks] promote and facilitate the electronic bookmaking activities of the Internet casinos through opening and authorizing merchant accounts, authorizing, clearing, transmitting, approving, paying and collecting electronic purchases. . . ." Bradley Complaint at ¶ 91, Thompson Complaint at ¶ 80. In short, plaintiffs claim that the alleged enterprise had a goal to promote Internet gambling on a worldwide basis.

The Court evaluates plaintiffs' allegations keeping in mind that it need not accept "legal conclusions masquerading as factual conclusions." Fernandez-Montes v. Allied Pilots Assoc., 987 F.2d 278, 284 (5th Cir. 1993). Brushing aside plaintiffs' conclusory statements, which the Court need not accept as true, the complaints allege that Visa and MasterCard jealously guard the use of their respective logos, making merchants apply to use their systems; permitted their logos to be used on the casino web sites for more than a year; allowed the casino charges to be processed through their system also used by millions of merchants. Additionally, a MasterCard employee attended an Internet gambling seminar and conducted an impromptu presentation on how to most effectively use its system, while Visa required its member banks to follow certain procedures to govern Internet transactions.[7]  Nowhere is there an allegation that any defendant

---

[7]There does not appear to be any allegation that either Travelers or Fleet Bank directed or participated in the enterprise's affairs.

exercised actual control over the enterprise. Cf., Bowdin Construction Corp. v. Rhode Island Hospital Trust National Bank, N.A., 869 F.Supp. 1004, 1009 (D. Mass. 1994) (complaint satisfies operation or management test when plaintiff alleges actual control). The question is whether these activities amount to "conducting or participating" under the statute and the Supreme Court's directives.

As stated infra, in Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163 (1993) the Court narrowly interpreted the meaning of the phrase "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." The Court found it was "clear that Congress did not intend to extend RICO liability under §1962(c) beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity" Id. at 184, 113 S.Ct. at 1172. Although the Court explained that a defendant need not have primary responsibility for directing an enterprise, it must have some part in directing the enterprise's affairs. Id. at 179, 113 S.Ct. at 1170. Outside those areas involving a single entity, the Court acknowledged that "[a]n enterprise might also be "operated" or "managed" by others "associated with" the enterprise who exert control over it, for example, by bribery." Id. at 184, 113 S.Ct. at 1173.

In application, courts have recognized that "[p]roviding important services to a racketeering enterprise is not the same as directing the affairs of the enterprise." See e.g., Amsterdam Tobacco, Inc. v. Philip Morris, Inc., 107 F.Supp.2d 210 (S.D.N.Y. 2000). In Amsterdam, plaintiffs alleged that retail stores were illegally selling vast quantities of cigarettes to smugglers. They plead that defendant Philip Morris knew that its retailers were selling the cigarettes to smugglers but nevertheless continued to supply the retailers with a supply of

36

cigarettes grossly out of proportion to the amount sold in the state of destination. Id. at 217.
The district court accepted the facts as true, analyzing the claim as though Philip Morris knew
that its product was going to illegal smugglers but continued to provide its product regardless. In
rejecting plaintiffs' claims, the court reasoned that, "[s]imply because one provides goods or
services that ultimately benefit the enterprise does not mean that one becomes liable under RICO
as a result." Id. (citations omitted).

    Courts in this district have followed similar reasoning.  For instance, in Succession of
Wardlaw v. Whitney National Bank, 1994 WL 577442 at *5 (E.D. La.  1994) the court dismissed
RICO charges that were brought against a commercial bank.  The court found that the bank's
involvement was limited to "process[ing] deposits and withdrawals." Id.  It went further to state
that, "[e]ven if it did so with the knowledge that these deposits and withdrawals were fraudulent,
such guilty knowledge is not enough to convert it into an active participant in the management of
the criminal enterprise." Id.

     Moreover, another court in this district has held that RICO liability does not always arise
even when the defendant has influence in the enterprise.  See In Re Taxable Municipal Bond
Securities Litigation, 1993 WL 534035 (E.D. La.  1993).    In that case, the court declined to
hold an attorney liable, reasoning that "[p]erformance of legal services that facilitate operation of
an enterprise does not represent participation in the "operation or management" of the enterprise.
This is so even when the defendant has substantial persuasive power to induce certain actions by
the enterprise, or as part of its professional services offers consultation on important management
decisions." Id. at *4 (citations omitted). See also Bowdin Construction Corp. v. Rhode Island
Hospital Trust National Bank, N.A., 869 F.Supp. 1004, 1009 (D. Mass. 1994) (allegation that

law firms, with full knowledge of the fraud being perpetrated, counseled their clients to continue

to participate in the fraudulent transactions is insufficient as a matter of law under <u>Reves</u>).  <u>See</u>

<u>generally</u> <u>Wilson v. Arch-Air Freight, Inc.</u>, 1997 WL 35279 (E.D. La. 1997) (no enterprise

when allegations solely accuse defendant of conducting its own affairs, not those of the

enterprise).

In <u>The Univ. of Maryland at Baltimore v. Peat, Marwick, Main & Company</u>, 996 F.2d

1534 (3rd Cir. 1993), plaintiffs sued an auditor for violations of §1962(c). The auditor performed

deficient audits, attended meetings of the Board of Directors of the enterprise corporation,

computerized the enterprise's accounting records and purchased an interest in a building

occupied by the enterprise. <u>Id</u>. at 1539. The Third Circuit panel held that plaintiffs failed to

allege violations meeting the <u>Reves</u> standard. It stated that the auditor's services, "were merely

financial services provided for [the enterprise], just as lawyers or computer technicians may have

provided valuable, indispensable services." <u>Id</u>. In reasoning that applies to the case before this

Court, the panel stated that "[s]imply because one provides goods or services that ultimately

benefit the enterprise does not mean that one becomes liable under RICO as a result." <u>Id</u>. <u>See</u>

<u>also</u> <u>Goren v. New Vision International Inc.</u>, 156 F.3d 721, 728 (7th Cir. 1998).

<u>Jubelirer v. MasterCard International, Inc.</u>, 68 F.Supp. 2d 1049 (W.D. Wisc. 1999) is

precisely on point with the issue before the Court. As stated above, the alleged conduct in

<u>Jubelirer</u> is indistinguishable from those before this Court. Applying the "operation or

management" test, the court decided that,

> Assuming that Casino 21 and its fellow on-line casinos constitute RICO
> "enterprises" the law is clear that merely having a business relationship with and
> performing services for such an enterprise, including financial, accounting and

38

> legal services, does not support RICO liability because performance of such
> services is not the equivalent of participation in the operation and management of
> the enterprise. Goren, 156 F.3d 721, 728 (collecting cases at n. 7). This is true
> even though the service provider knows of the enterprise's illicit nature or
> performs improper acts itself. Id. In all such cases the services performed facilitate
> the enterprise's activities, but that alone is not enough to satisfy the requirement.
> This clearly established principle cannot be circumvented by attempting to
> characterize a routine contractual relationship for services as an independent
> enterprise.

Jubelirer at 1053.

Overall, accepting plaintiffs' allegations as true, they have alleged no more than the

existence of a business relationship. Allegations of a business relationship do not indicate that

defendants took part in directing the enterprise's affairs. See Goren v. New Vision International

Inc., 156 F.3d 721, 728 (7th Cir. 1998).

Sikes v. American Telephone & Telegraph, 179 F.R.D. 342 (S.D. Ga. 1998), cited by

plaintiffs, provides a perfect contrast to the facts as alleged in this case and demonstrates why

plaintiffs cannot satisfy Reves. In Sikes, plaintiff sued, among others, AT&T for its part in

operating a 900-number "Let's Make a Deal Game." Id. at 345. Defendant claimed that the

RICO claims levied against it should be dismissed because it simply provided

telecommunication, billing and collection services to the game's creator. Id. at 353. According

to the phone company, merely rendering such services did not meet the requisite level of

participation under Reves. The Court denied defendant's motion for summary judgment finding

issues of fact as to the defendant's illustrative actions, including "approv[ing] and edit[ing] the

scripts and the advertising used in the . . .game, review[ing] and alter[ing] the prize structure and

rules of the game, and exercis[ing] control over the length and price of calls to the. . .game." Id.

at 353.

In Sikes, the district court recognized that defendants can be held liable when they actually participate in the functions of the allegedly illegal activity. In this case, there is no averment with respect to the defendants' involvement with Internet casino advertising, the types or rules of the games offered, the odds or the web site composition. All that is alleged is that the defendants' provided financial services in much the same manner they do to millions of others. Plaintiffs' allegations fail to meet the Reves threshold, another defect sufficient to dismiss their §1962(c) claim. Despite this fatal finding, the Court will continue to analyze the remaining element unique to section 1962(c), person/enterprise distinctness.

### B. RICO person must be distinct from the RICO enterprise

Based on the wording of 18 U.S.C. §1962(c), proscribing conduct only for those "persons employed by or associated with any enterprise", the courts have decided that "the RICO person and the RICO enterprise must be distinct." Crowe v. Henry, 43 F.3d 198, 205-06 (5th Cir. 1995)(citing Bishop v Corbitt Marine Ways, Inc., 802 F.2d 122, 123 (5th Cir. 1986)). In this case, Bradley names as defendants Visa International and Travelers Bank. He describes the enterprise as consisting of "the Internet casino(s), Visa and Travelers." Thompson names as defendants MasterCard and Fleet while describing the enterprise as "the Internet casino(s), MasterCard and Travelers."

Insofar as plaintiffs have alleged the existence of particular casinos in the body of their respective complaints who are not named as defendants, the Court concludes that for the purposes of these motions, the RICO enterprise and the RICO defendants are distinct.

In Crowe v. Henry, 43 F.3d 198 (5th Cir. 1995), the Court of Appeals analyzed an

analogous situation, except that the case involved individuals as opposed to corporate entities. In

Crowe, the plaintiff alleged an association in fact enterprise consisting of himself and the

defendant Henry (Crowe-Henry). Id. The court held that the association in fact of Crowe-Henry

was not distinct from the defendant, Henry. Although the alleged enterprise consisted of two

persons and the defendant was only one of those persons (necessarily excluding the other), the

court held that plaintiff failed to satisfy the distinctness requirement because "a RICO person

cannot employ by or associate with himself under this subsection." Id. at 206 (citing In re

Burzynski, 989 F.2d 733-43 (5th Cir. 1993)). See also 5-Star Premium Finance, Inc. v. Wood,

2000 WL 533941 (E.D. La. 2000)(where defendant is part of the association in fact enterprise,

§1962(c) claim is dismissed because a RICO person cannot associate with himself).

Plaintiffs' reliance on a pre-Crowe case, American Millworks v. Mellon Bank Corp.,

1991 WL 112015 (E.D. La. 1991) is unavailing. In American Millworks, Mellon Bank, N.A

("MBNA") was the RICO defendant, and the alleged enterprise consisted of a group of other

Mellon Bank corporations. Id. at *5. Plaintiffs alleged that MBNA associated with those other

corporations through a pattern of racketeering activity. The court held that plaintiffs properly

plead RICO person- RICO enterprise distinctness under §1962(c) because "a subsidiary

corporation is certainly a legal entity distinct from its parent." Id. at *5. In other words,

American Millworks is completely consistent with the reasoning in Crowe and Williamson,

discussed supra, in that the court reasoned that an enterprise was properly plead when there was

no commonality between the defendant (MBNA) and the enterprise (a group of corporations not

consisting of MBNA or any legally synonymous entity).

However, after briefs were submitted in this case, the Fifth Circuit decided St. Paul

Mercury Insurance Co. v. Williamson, 224 F.3d 425 (5th Cir. Aug. 17, 2000). There, the Court

analyzed the evolution of the Fifth Circuit decisions, including Bishop, Burzynski and Crowe,

that discuss the RICO person-RICO enterprise distinctness requirement. Upon a review of the

jurisprudence the panel concluded that,

> when Bishop, the decision to which the *Burzynski* court cited for support, held
> that to state a §§ 1962(c) claim, a plaintiff had to distinguish between the RICO
> person and the RICO enterprise, **it was not making the sweeping generalization**
> **that any congruence between a RICO person and a member of an**
> **association-in-fact, which constituted a RICO enterprise, violated the**
> **person/enterprise distinction**. Instead, *Bishop* merely concurred with the vast
> majority of the circuits that held that a § 1962(c) claim requires a distinction
> between the RICO person and the RICO enterprise. Those circuits were discussing
> the person/enterprise distinction where the plaintiffs were alleging a corporate
> entity as both a RICO defendant and a RICO enterprise.

Id. at 446 (emphasis added).

In other words, the strict reading of the enterprise/person distinctness requirement originally

contemplated cases where a single corporate entity was the defendant, and that same single

corporate entity was alleged to be the enterprise. Under that paradigm, the corporate defendant

was sued as a RICO person in its own right or capacity, not as a cog in an association in fact

enterprise. The Fifth Circuit pointed out that the analysis with respect to an association in fact

enterprise is somewhat different in that,

> Where persons associate "in fact" for criminal purposes, ... each person may be
> held liable under RICO for his, her or its participation in conducting the affairs of
> the association in fact through a pattern of racketeering activity. But the nebulous
> association in fact does not itself fall within the RICO definition of "person[ ]"....
> In the association in fact situation, each participant in the enterprise may be a
> "person" liable under RICO, but the association itself cannot be. By contrast, a
> corporation obviously qualifies as a "person" under RICO and may be subject to
> RICO liability.

Id. at 401 (quoting Haroco, Inc. v. American National Bank & Trust Co., 747 F.2d 384, 399 (7th

Cir. 1994).

Applying those principles to the matter before it on appeal, the Court of Appeals reversed

the district court's grant of summary judgment against 3 individual RICO persons who were also

alleged to be the RICO enterprise. With respect to an association in fact enterprise, the Court of

Appeals reasoned that

> Indeed, " '[a] collective entity is something more than the members of
> which it is comprised.' " *United States v. Fairchild,* 189 F.3d 769, 777 (8th
> Cir.1999) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995
> (8th Cir.1989)). "Although a defendant may not be both a person and an
> enterprise, a defendant may be both a person and a part of an enterprise. In such a
> case, the individual defendant is distinct from the organizational entity." *Id.*
> Otherwise, an individual member of a collective enterprise, such as an
> association-in-fact, could not be prosecuted for violating §§ 1962(c) because he or
> she would not be considered distinct from the enterprise.

Id. at 447.

Of course Williamson was decided in the context of a group of individuals named as both

RICO persons and the RICO enterprise. In the case before this Court, it is corporations who are

named as RICO persons and part of the RICO enterprise. However, each defendant corporation

is sued for its actions as a "position player" in the "team" enterprise. The RICO persons are not

identical in name or function to the alleged enterprise. The defendants are not the entire

association in fact enterprise and can be named as defendants under Williamson.[8] See also David

---

[8]The Court of Appeals recognized the general dissatisfaction with the ease by which a
plaintiff can avoid the person/enterprise distinctness requirement when it stated that:
> the criticism pertaining to having corporations listed as being a part of the
> association-in-fact is due to the fact that a "§ 1962(c) enterprise must be more than
> an association of individuals or entities conducting the normal affairs of a
> defendant corporation." *Id.; see also Old Time Enters. v. International Coffee
> Corp.*, 862 F.2d 1213, 1215 (5th Cir.1989). The criticism is generally unwarranted
> where corporations are not involved.

B. Smith & Terrance G. Reed, *Civil RICO*, §3.05, p. 3-43 (Matthew Bender & Co. 2000)( "[i]n particular, the rule that the enterprise may not be the same entity as the defendant alleged to have committed a §1962(c) violation may be undermined by simply pleading the enterprise as an association in fact including the defendant entity but not limited to it."); See generally, River City Markets, Inc. v. Fleming Foods West, Inc., 960 F.2d 1458 (9th Cir. 1992)(one can associate with a group of which he is a member, with the member and the group remaining distinct entities).

## VI. Aiding and Abetting a §1962(c) violation[9]

Plaintiffs also assert a cause of action premised on aiding and abetting liability. They state that "[b]ecause Defendants have formed an illegal Internet gambling enterprise, conducted and/or facilitated Internet casino betting and collected unlawful debt, they have participated as a principal within the meaning of 18 U.S.C. §2 and are liable as an aider and abettor to the violation of 18 U.S.C. §1962(c)." Bradley Complaint at ¶ 113; see also Thompson Complaint at ¶35.

This argument fails as plaintiffs' underlying §1962(c) claim is meritless. Without a

---

Id. at 446, note 16.

This Court recognizes the criticism, but finds that under the law as it exists, plaintiffs have properly alleged the distinctness requirement. However, concerns that corporations will be vilified for merely "conducting their normal affairs" is generally unwarranted as those corporations will be shielded by the "operation or management" prerequisite to §1962(c) liability.

[9]In a subheading of his complaint, plaintiff Bradley cites the applicable statute as §1964(a). However, in his factual allegations plaintiff clearly refers to defendants' as aiders and abettors to a §1962(c) violation. The Court will accordingly analyze plaintiffs' claim as one for aiding and abetting a §1962(c) violation.

violation of the underlying substantive offense, there can be no aiding and abetting liability. That being said, it is doubtful that an aiding and abetting liability cause of action exists under §1962(c).

"Until 1994, it was considered well established that civil RICO liability can also be predicated on aiding and abetting the commission of the predicate acts by the primary offender." David B. Smith & Terrance G. Reed, *Civil RICO*, §3.07, p. 3-86.10 (Matthew Bender & Co. 2000). In 1994, the Supreme Court handed down its decision in <u>Central Bank of Denver v. First Interstate Bank of Denver</u>, 511 U.S. 164, 114 S.Ct. 1439 (1994). In <u>Central Bank</u>, the issue before the Court was "whether private civil liability under §10(b) [of the Securities Exchange Act of 1934] extends as well to those who do not engage in the manipulative or deceptive practice but who aid and abet the violation." <u>Id</u>. at 167, 114 S.Ct. at 1443. The Court looked to several different statutes under the 1934 Act as well as other acts, and found that "Congress knew how to impose aiding and abetting liability when it chose to do so. . . If. . . Congress intended to impose aiding and abetting liability, we presume it would have used the words "aid" and "abet" in the statutory text." <u>Id</u> at 176-77, 114 S.Ct. at 1448.

In reaching its decision the Court stated that "Congress. . . has taken a statute by statute approach to civil aiding and abetting liability." <u>Id</u>. at 182, 114 S.Ct. at 1451. As examples in support of this proposition the Court cited several federal statutes that provide civil aiding and abetting liability including, The Internet Revenue Code, The Commodity Exchange Act, the National Bank Act, the Federal Reserve Act, the Packers and Stockyard Act, and other provisions of the securities laws. <u>Id</u>. at 183-84, 114 S.Ct. at 1451. Although the list was merely illustrative, it is noticeable that the Court did not include the RICO statute as one that provides aiding and

abetting liability.

Three additional points addressed by the <u>Central Bank</u> Court seem to apply to the situation before this Court. First, the term "directly or indirectly" does not include aiding and abetting liability because the latter course of conduct encompasses a broader range of activities than the former. <u>Id</u>. at 176, 114 S.Ct. at 1448. Second, there is no presumption that aiding and abetting liability attaches to all federal civil statutes. <u>Id</u>. at 183, 114 S.Ct. at 1451. Finally, aiding and abetting liability cannot be imposed when to do so would relieve a plaintiff of proving a critical element of his cause of action. In <u>Central Bank</u>, the Court was concerned that to allow aiding and abetting would relieve a plaintiff of his burden of proving a critical element for recovery under 10b-5, reliance. <u>Id</u>. at 180, 114 S.Ct. at 1449-50. The Court reasoned that to allow aiding and abetting liability in the 10b-5 context would "allow[] plaintiffs to circumvent reliance requirement [and] would disregard the careful limits on 10b-5 recovery mandated by our earlier cases." <u>Id</u>. at 180, 114 S.Ct. at 1450.

Applied to the case before this Court, §1962(c) does not use the terms "aid" or "abet"; the statute does contain the words "directly or indirectly", which is not sufficient to impose aiding and abetting liability, and ; to allow aiding and abetting liability would relive a plaintiff of proving reliance upon the mail fraud and wire fraud imposed by <u>Summit</u>. As a result the Court finds that there is no cause of action for aiding and abetting a §1962(c) violation.

Several courts have held that such liability can no longer be imposed after the United States Supreme Court's decision in <u>Central Bank</u>. See, <u>e.g.</u> <u>Pennsylvania Association of Edwards Heirs v. Rightenour</u>, 235 F.3d 839 (3rd Cir 2000) ("the text of RICO does not encompass a private cause of action for aiding and abetting a RICO violation); <u>Jubelirer v.</u>

MasterCard International, Inc., 68 F.Supp. 2d 1049 (W.D. Wisc. 1999); Department of Economic

Development v. Arthur Anderson & Co., 924 F.Supp. 449 (S.D.N.Y. 1996); Touhy v. The

Northern Trust Bank, 1999 WL 342700 (N.D. Ill. 1999). Although the circuit court has yet to

address the issue, one district court in this district has stated that aiding and abetting remains a

viable theory of recovery under 1962(c), even after Central Bank. See Succession of Wardlaw v.

Whitney National Bank, 1994 WL 577442 (E.D. La. 1994). Although the court recognized that

"the Central Bank opinion contains sweeping language which arguably could apply to RICO", it

declined to apply Central Bank because that opinion "discusses many elements that are highly

specific to the Securities Exchange Act." Id. at 6. In light of the recent trend in the

jurisprudence, this Court feels compelled to depart from Wardlaw's reasoning. The Courts of

Appeals for the Second and Third Circuits, whose opinions the Wardlaw court relied upon in

conjunction with a pre- Central Bank Fifth Circuit case, have altered their stances on aiding and

abetting liability. See, e.g. Pennsylvania Association of Edwards Heirs v. Rightenour, 235 F.3d

839 (3rd Cir 2000); Department of Economic Development v. Arthur Anderson & Co.,

924F.Supp. 449 (S.D.N.Y. 1996). Additionally, the plaintiff in Wardlaw plead aiding an

abetting liability in the alternative to primary liability under sections (a), (b), and (c) of the

statute. 18 U.S.C. 1962(a) actually incorporates aiding and abetting liability through reference to

the general federal aiding and abetting statute, 18 U.S.C. §2, which may have contributed to

Wardlaw's holding. This Court is confronted solely with a claim under §1962(c), which does

not use the words aid or abet, and more importantly does not incorporate the general aiding and

abetting statute by reference. Furthermore, the Court agrees with the commentators who point

out that "[i]f Congress' restriction of 1962(c) liability to those who operate or manage the

47

enterprise can be avoided simply by alleging that a defendant aided and abetted or conspired with someone who operated or managed the enterprise, then <u>Reves</u> would be rendered almost useless." David B. Smith & Terrance G. Reed, *Civil RICO*, §5.04, p. 5-45 (Matthew Bender & Co. 2000).   Thus, without further guidance from the higher court, this Court finds that aiding and abetting liability under §1962(c) was eliminated by the Court's holding in <u>Central Bank</u>.

Although plaintiffs' RICO claims fail for the reasons stated herein, the Court will address standing under §1964, to completely address all issues with respect to plaintiffs' cause of action.

## VII.  Standing to sue under 18 U.S.C.  §1964(c)

Standing generally is a threshold consideration for any Court before moving on to the merits.  However, RICO standing is unique in that a civil plaintiff has standing to assert a civil cause of action only if a violation of §1962 proximately caused his injuries.  Therefore, to avoid the duplicative analysis, the Court sought to initially determine whether a section 1962 violation occurred.  Since plaintiffs' claims under §1962(c) fail to state a cause of action, the Court need not address the standing issue but will discuss it nevertheless for the sake of completeness.  Even if plaintiffs had successfully asserted a §1962 violation, causation precepts imposed by the remedial portion of the RICO statute, section 1964, would preclude plaintiffs from continuing with their claims because they have no standing.

"As a preliminary matter. . . a [18 U.S.C. §1964(c)] plaintiff must establish that he has standing to sue." <u>Price v. Pinnacle Brands, Inc.</u>, 138 F.3d 602, 606 (5th Cir. 1998); <u>Ocean Energy II, Inc. v. Alexander & Alexander</u>, 868 F.2d 740, 742 (5th Cir. 1989).   As recited <u>infra</u>, RICO's civil damages provision requires that a plaintiff be injured "by reason of" a RICO

violation. Therefore, "a RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by [reason of] the conduct constituting the violation." Holmes v.  Securities Investor Protection Corp., et al, 503 U.S. 258, 279, 112 S.Ct 1311, 1323 (1992)(O'Connor, J.  concurring) (citing Sedima, S.P.R.L. v.  Imrex Co., 473 U.S. 479, 495, 105 S.Ct.  3275, 3284 (1985)).  The United States Supreme Court has rejected the proposition that the "by reason of" limitation in 1964(c) requires a simple showing that the defendant's violation of §1962 was a "but for" cause of plaintiff's injury and has instead instructed that defendant's violation of §1962 be the proximate cause of plaintiff's injury. Holmes v.  Securities Investor Protection Corp., et al, 503 U.S. 258, 265-66, 112 S.Ct 1311, 1316 (1992); See also  Whalen v.  Carter, 954 F.2d 1087, 1091 (5th Cir.  1992) ("a plaintiff has statutory standing to bring a claim so long as the defendants' predicate acts constitute both factual and proximate cause of the plaintiff's alleged injury").  "The pertinent inquiry in determining the existence of proximate, or "legal" cause, is "whether the conduct has been so significant and important a cause that the defendant should be held responsible." Chisolm v. Transsouth Financial Corp., 95 F.3d 331, 336 (4th Cir.  1996)(citations omitted).[10]

The plaintiffs state that "[d]efendants send through interstate telephone lines and the United States Mail, invoices, collection notifications, and other communications intended to collect gambling debts and otherwise participate in the Internet gambling enterprise."  Bradley Complaint at ¶ 97, Thompson Complaint at ¶ 86.  Plaintiffs allege mail fraud based upon the defendants' monthly mailing of billing statements.  Bradley Complaint at ¶ 99, Thompson

---

[10] These causation requirements have prompted one court to find that "[c]ivil RICO is of course a statutory tort remedy— simply one with particularly drastic remedies." Zervas v. Faulkner, 861 F.2d 823, 834 (5th Cir. 1988).

Complaint at ¶ 88. They alleged wire fraud based upon the "[d]efendants open[ing] and authoriz[ing] merchant accounts and thereafter author[izing], clear[ing[, tramsitt[ing], approv[ing], pay[ing] and collect[ing] electronic purchases of bets. . ." Bradley Complaint at ¶ 101, Thompson Complaint at ¶ 90. Plaintiffs claimed that "but for" the worldwide processing and payment systems "[i]nternet gambling would be difficult, if not impossible." See Bradley Complaint at ¶110, Thompson Complaint at ¶99. It is their position that the defendants knew the nature of their activities and allowed U.S. citizens to engage in allegedly illegal behavior on the internet. By making their services available, defendants' activities have made "every [Visa or MasterCard] holder a potential customer of Internet gambling bookmakers." Bradley Complaint at ¶54, Thompson Complaint at ¶ 43. As such, "but for [the credit card companies] willingness and knowing participation in the operation and financing of illegal gambling activities in the United States through the Internet, Internet gambling would be difficult, if not impossible to accomplish." Bradley Complaint at ¶ 110, Thompson Complaint at ¶ 99. Such allegations plead factual causation but fall short of pleading legal causation.

As regards legal causation, this Court agrees with the observations of the United States Court of Appeals for the Third Circuit also in response to a racketeering suit brought by frustrated gamblers: "[u]nlike an ordinary RICO victim, in this case the allegedly injured plaintiffs, i.e., the players, can avoid any injury simply by walking away from the alleged wrongdoers, the casinos, by not playing. . .in the casinos." Doug Grant, Inc. v Greate Bay Casino Corp., 232 F.3d 173, 187-88 (3rd Cir. 2000). Employing traditional proximate cause analysis, "plaintiffs received "exactly what they paid for and they do not and cannot allege otherwise." See Price v. Pinnacle Brands, Inc., 138 F.3d 602, 606 (5th Cir. 1998).

Although plaintiffs cry out as victims in this case, they are in a precarious position because of their own voluntary acts of internet gambling. Plaintiffs' own acts of accessing the internet, locating the casinos, entering their information, and playing electronic casino games, are all intervening causes that break the chain of causation with respect to the defendants' alleged activities, even if they were illegal. See generally Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 240 (2d Cir. 1999).

Additionally, plaintiffs failed to plead the reliance requirement imposed by Summit Properties, Inc. v. Hoechst Celanese Corp, 214 F.3d 556 (5th Cir. 2000). Thus, even if plaintiffs adequately plead a violation of the federal mail or wire fraud statutes, as RICO plaintiffs they are required to plead an additional element not necessary under the statutes as codified. Although reliance is not an element of statutory mail fraud or statutory wire fraud, the court held that reliance on predicate mail or wire fraud is necessary in order to establish proximate causation. Id. at 562. Therefore, plaintiffs "face[] an additional hurdle" and must show that they relied upon the alleged fraudulent practices of the defendants. Id at 559. As to the alleged wire fraud, plaintiffs do not even allege that they were aware of such activities; therefore plaintiffs could not rely upon an activity of which they were not aware. The allegations of mail fraud suffer from the same defect. Nowhere in the complaints is there an allegation that plaintiffs relied upon a representation of any defendant in deciding to gamble. Clearly, plaintiffs cannot claim to rely upon a billing statement that arrives after they gambled.

The Court finds that even if the defendants' actions in connection with internet casino gambling were illegal, which they are not, plaintiffs' inability to plead proximate causation prevents them from pursuing civil remedies under §1964(c).

The Court finds this case quite different from the typical RICO case, appropriately described by the United States Court of Appeals for the Seventh Circuit as follows,

> [t]he prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could do in his own person, that is without channeling his criminal activities through the enterprise that he has taken over.

Fitzgerald v. Chrysler Corp., 116 F.3d 225, 227 (7th Cir. 1997).

Simply put, the Court finds that RICO, no matter how liberally construed, is not intended to provide a remedy to this class of plaintiff. The remedial portion of the statute was intended to provide a remedy for victims of racketeering activity as described in section 1962. Plaintiffs in these cases are not victims, they are independent actors who made a knowing and voluntary choice to engage in a course of conduct. Litigation over their own actions arose only when the result of those actions became a debt that they did not wish to pay. At this point in time, Internet casino gambling is not a violation of federal law. To the extent that plaintiffs' unsuccessful venture in a legal activity turned out to be less than profitable, they have no remedy at law.

The Court is mindful that motions to dismiss should be rarely granted. However, in this case, plaintiffs fail to plead several elements necessary to sustain a RICO claim as a matter of law, including failure to allege any racketeering activity, the existence of an enterprise, the requisite level of conduct or control, and standing. The defects in plaintiffs' complaints appear insurmountable. With such a legally flawed cause of action, the Court must dismiss plaintiffs' RICO claims without leave to amend. See e.g., Hart v. Bayer Corp., 199 F.3d 239, 248, note 6 (5th Cir. 2000) (court should not generally dismiss without leave to amend unless defect is simply

52

incurable); <u>Knevelbaard Dairies v. Kraft Foods, Inc.</u>, 232 F.3d 979, 983 (9th Cir. 2000) (leave to amend must be granted unless amendment would be futile); <u>Confederate Memorial Association v. Hines</u>, 995 F.2d 295, 299 (D.C. Cir. 1993) (district court acted properly when it failed to grant leave to amend granting motion to dismiss when dismissed party does not indicate particular grounds and dismissed party previously brought same suit in another court); Wright & Miller, <u>Federal Practice & Procedure</u>, §1483, p. 588.

 Therefore, the court finds that the defendants motions shall be granted.


### The Rule 19 Motions

 In light of this Court's rulings on the Rule 12(b)(6) motions, the Rule 19 motions concerning failure to join indispensable parties are moot.

Accordingly,

 **IT IS ORDERED** that the motions to dismiss of MasterCard, Visa, Travelers and Fleet are **GRANTED**.

 **IT IS FURTHER ORDERED** that the remainder of the cases that comprise MDL 1321 and MDL 1322, as referenced in footnote 1 of this order, are hereby **STAYED** and ordered **statistically closed** pending further action by this Court.

 **IT IS FURTHER ORDERED** that the Rule 19 motions are dismissed as **MOOT**.


New Orleans, Louisiana, this 23rd day of February 2001.

      STANWOOD R. DUVAL, JR.
      UNITED STATES DISTRICT JUDGE

53